**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

| | |
|---|---|
| SHANA DOTY, individually and on behalf of all others similarly situated, | Case No.: 20-cv-60972-RKA |
| *Plaintiff,* | Judge Raag Singhal |
| *v.* | Magistrate Judge Patrick M. Hunt |
| ADT, LLC d/b/a ADT SECURITY SERVICES, a Delaware limited liability company, and TELESFORO AVILES, an individual, | |
| *Defendant.* | |

## FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Shana Doty ("Plaintiff") brings this Class Action Complaint and Demand for Jury Trial against Defendant ADT, LLC d/b/a ADT Security Services ("ADT"), based on its intentional and negligent tortious acts in providing security services to its customers with remote-viewing capabilities, and Defendant Telesforo Aviles ("Aviles"), for using those services to spy on Plaintiff and other ADT customers. Plaintiff alleges as follows upon personal knowledge as to herself and her own acts and experiences, and, as to all other matters, upon information and belief.

### NATURE OF THE ACTION

1.       In April of 2020, Shana Doty received a terrifying phone call from ADT: the technician who had worked on her indoor security camera system, Telesforo Aviles, had granted himself remote access, and had used that access an unknown amount of times to spy on her, her husband, and her minor son in their most private moments.

1

2.     And Ms. Doty was not the only one. She soon found out that hundreds of households had experienced the same staggering invasion of privacy over at least a *seven-year* period. At fault for this breach of trust: ADT's unsecure and unmonitored "security" services.

3.     While ADT boasts that it has been protecting people for over 145 years and holds itself out as the "#1 in smart home security" it failed to even secure its own systems from massive and ongoing intrusions into its customers' private lives.

4.     ADT failed to provide the security services its customers paid for by leaving large vulnerabilities in the ADT Pulse application and, as a result, compromised the safety and security of its customers' homes and family members. The ADT vulnerability allowed any one of its technicians to grant themselves (or for them to grant anyone else, for that matter) access to a customer's ADT Pulse application and control every aspect of the customer's home security systems, including surreptitiously opening locks, disarming their system, and viewing and downloading security camera footage.

5.     Remarkably, just three months before ADT revealed this vulnerability, ADT conducted a survey recognizing the "strong consumer expectations" of security that consumers had in their smart home products: "With many data privacy and security issues in the news, it's no surprise that 92 percent of respondents feel smart home security companies need to take measures to protect customers' personal data and information."[1] ADT bragged that it was leading the industry in establishing "best practices" for the protection of consumer privacy, one of which was strict standards for access to data, promising that "[s]ecurity providers will only share audio or

---

[1]     *ADT Survey Reveals Strong Consumer Expectations for Smart Home Privacy Protections*, ADT (Jan. 27, 2020), https://investor.adt.com/press-releases/press-release-details/2020/ADT-Survey-Reveals-Strong-Consumer-Expectations-for-Smart-Home-Privacy-Protections/default.aspx (permanent link available at https://cite.law/RNP5-BT3U).

video with first responders with their customers' prior consent, or as required by law, and will not otherwise access a customer's audio or video without the customer's knowledge."

6.      In a frantic effort to mitigate and hide the fact that the vulnerability in its supposedly industry-leading smart home security systems permitted an employee to spy on customers, ADT began a campaign to call all affected account holders and secure a release and confidentially agreement in exchange for a monetary payment representing a fraction of the value of their claims. This effort, directed by lawyers but carried out by customer service representatives, failed to determine whether individuals were represented by counsel, and attempted to mislead them into believing that the release would cover account holders and non-account holders in the household alike.

7.      Beyond Aviles, potentially countless other unknown individuals have been accessing customers' ADT Pulse accounts and surreptitiously viewing their camera footage, for years, all around the country.

8.      The mental and emotional impact this revelation has had on every person receiving these calls from ADT is immeasurable. Moments once believed to be private and inside the sanctity of the home are now voyeuristic entertainment for a third party. And worse, those moments could have been captured, shared with others, or even posted to the internet. ADT's failure to protect its customers irreparably destroyed their sense of security, safety, intimacy, and well-being.

## PARTIES

9.      Plaintiff Shana Doty is a natural person and a citizen of the State of Texas.

10.      Defendant ADT, LLC is a limited liability company organized and existing under the laws of Delaware with its principal place of business located at 1501 Yamato Road, Boca Raton, Florida 33431.

3

11. Defendant Telesforo Aviles is a natural person and a citizen of the State of Texas.

## JURISDICTION AND VENUE

12. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2), because (i) at least one member of the Class is a citizen of a different state than Defendant ADT, (ii) the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (iii) none of the exceptions under that subsection apply in this action.

13. This Court has personal jurisdiction over Defendant ADT because Defendant ADT conducts business in Florida and has its headquarters in this District. This Court has personal jurisdiction over Defendant Aviles because Defendant Aviles conducts business in Florida through his employment with Defendant ADT.

14. Venue is proper pursuant to 28 U.S.C. § 1391(b) because Defendant ADT maintains its headquarters and conducts significant business in this District.

## COMMON FACTUAL ALLEGATIONS

*I.* *ADT Promises Safety and Security to Consumers.*

15. ADT is a home security company that touts its longstanding expertise in security and claims to have been providing security services since the 19th century. According to ADT, it has "been helping protect homes longer than any other company in the business." ADT provides residential security systems and monitoring plans that purportedly "protect what matters most in your life." In short, ADT promises that it is "fully committed to your security."[2]

---

[2] ADT Services | In-Home Consultation, Installation, Repairs, Customer Support, https://www.adt.com/services (last visited July 15, 2020).

16.     ADT markets and sells a comprehensive security system package that includes the hardware necessary to operate a home security system, the monitoring services that detect home intrusions and alert the police, and the security system installation.

17.     ADT offers various tiers of its home security systems at different price points. The basic tier, for example, features security monitoring equipment with 24/7 alarm monitoring while the highest tier home security package includes various convenience and home automation features.

18.     One of the highest tier home security packages is ADT Pulse. ADT Pulse allows consumers to "check on your home - even if you're away" by giving them remote access to control their home security system from a mobile application or a web browser portal. Specifically, consumers can arm and disarm their home security systems, remotely lock and unlock doors, view live camera footage, and control various smart home devices like a thermostat and lights. *See* Figure 1, showing a screenshot of ADT's marketing materials for ADT Pulse.[3]



---

[3]     ADT Pulse® | Official ADT Smart Home Automation System, https://www.adt.com/pulse (last visited July 15, 2020).

(**Figure 1.**)

19.     Consumers must purchase various smart devices from ADT to reap the benefits of

the ADT Pulse service and all the advertised remote accessibility features. ADT touts that its smart

home features are not only more convenient to consumers, but they provide "smarter security."

For example, ADT claims that the purchase of its smart locks for use with the ADT Pulse system

will result in a "whole new level of security and convenience…" as shown in Figure 2.



## More convenience. Smarter security.

Smart door locks add a whole new level of security and convenience to a smart ADT security system, allowing you to easily let people in – or keep them out – remotely.

(**Figure 2.**)

20.     Most importantly, ADT encourages consumers to purchase video cameras for both

outdoors and indoors uses to "keep an eye on the things you value most."[4] The indoor cameras,

according to ADT, are specifically intended to "check in on your kids" and can be set up to stream

and capture video clips of events "like when your kids get home from school."[5]

21.     Consumers use the ADT Pulse mobile application to "check any or all of your ADT

home security cameras" and to "look in on your family and your pets any time with live-streaming

---

[4]     Wireless Home Security Cameras & Video Surveillance Cameras | ADT, https://www.adt.com/security-cameras (last visited July 15, 2020).

[5]     Shop ADT® Indoor Home Security Cameras | ADT, https://www.adt.com/indoor-security-camera (last visited May 7, 2020).

6

video." Furthermore, consumers are able view stored video clips from their security cameras on their phones via the ADT Pulse mobile application.[6]

22.     To use the ADT Pulse smart home features—like remotely viewing security camera footage, disarming a security system, or unlocking smart locks—consumers must login into the ADT Pulse mobile application or the ADT Pulse web browser portal by using their username and password. Anyone with valid login credentials, like a family member, can access and control the security system remotely.

23.     For the ADT Pulse system to function correctly, an ADT technician needs to perform the system installation and configuration.

24.     Each new security system installation comes with a "worry-free professional installation" where "highly-trained ADT technicians will set-up your ADT security system so you don't have to."[7] ADT technicians will also test the security system and assist the consumer in connecting their smart phone to the ADT security system for use with ADT Pulse, as shown in Figure 3.

---

[6]     *Supra* note 3.

[7]     ADT® | Compare Home Security System Packages | 2020, https://www.adt.com/compare (last visited July 15, 2020)



(**Figure 3.**)

25.     ADT further promotes its security services by stating that its technicians are what sets them apart from the competitors in being able to earn its customers' trust and protect the most important people in their lives. According to its website: "Our people are dedicated to taking care of the people and property you value most in your life. Our customers trust us to help protect those things that cannot be replaced." *See* Figure 4, showing a screenshot from ADT's website.[8]

> # Our people set us apart
>
> Our people are dedicated to taking care of the people and property you value most in your life. Our customers trust us to help protect those things that cannot be replaced.

---

[8]     Why ADT has the Best Home Security and Customer Service | ADT, https://www.adt.com/security-benefits (last visited May 7, 2020).

(**Figure 4.**)

26.     Moreover, ADT knows precisely how important the security of smart home devices is to consumers. ADT went out of its way to commission a survey of more than 1,200 consumers in December 2019, and found that 92% of consumers felt that "smart home security companies [like ADT] need to take measures to protect customers' personal data and information." And ADT went so far as to issue a press release dedicated to saying it was doing just that, in order to "maintain consumer trust and promote responsible data privacy practices within the industry."

27.     The greatest concern that consumers had, revealed by ADT's survey, was "hacking." In response to those concerns, ADT boasted that it was leading the industry in creating a "Consumer Privacy Initiative," to create "clear guiding principles and best practices" for how security providers "manage consumer data and protect their privacy." Those principles included "Privacy by Design," promising to "embed[]" privacy "in all areas of the security industry," which "begins with the design of the products used to help protect and connect customers." They also included, specifically, "Handling of Audio and Video," claiming that security providers would share audio or video only with prior consent and would otherwise never "access a customer's audio or video without the customer's knowledge."[9]

## II.     ADT Failed to Detect a Seven-Year-Long Breach of its Systems That, at the Very Least, Resulted in an ADT Employee Improperly Accessing Customers' Accounts.

28.     Unfortunately for all of ADT's Pulse customers, a vulnerability in the Pulse security system completely obliterates all of ADT's promises of security and protection.

---

[9] *ADT Survey Reveals Strong Consumer Expectations for Smart Home Privacy Protections*, ADT (Jan. 27, 2020), https://investor.adt.com/press-releases/press-release-details/2020/ADT-Survey-Reveals-Strong-Consumer-Expectations-for-Smart-Home-Privacy-Protections/default.aspx (permanent link available at https://cite.law/RNP5-BT3U).

29.     On or around April 23, 2020, ADT began to contact some of its customers to inform them that a vulnerability in the ADT Pulse system had allowed unauthorized users to access customers' ADT Pulse accounts as if they were a regular user. In other words, an unauthorized user could remotely arm and disarm security systems, access smart home devices, and view and download security camera footage, including footage from indoor cameras designed to, among other things, protect their children.

30.     In fact, ADT's investigation revealed that at least one ADT employee in the Dallas-Fort Worth, Texas area, named Telesforo Aviles, had access to more than *200 different customers'* ADT Pulse accounts for *the last seven years*. According to an ADT spokesperson, Aviles was able to add—and, in fact, did add—his own personal email address to customers' accounts, allowing him to remotely login to a customer's account using his own unauthorized credentials.

31.     This type of access could only occur because ADT failed to implement adequate procedures that would prevent non-household members from adding non-household email addresses. Similarly, ADT failed to monitor consumers' accounts and promptly alert them anytime a new email was added to their accounts. Countless checks could have been in place to prevent or at least stop this conduct. Instead, this breach came to light only by luck and happenstance: a customer, reporting a technical issue, inadvertently revealed the unwanted third-party access. But for that event, ADT would be unaware of this invasive conduct and it would continue unabated to this day (and likely expanding to new households).

32.     As such, countless other ADT technicians and/or employees could have taken advantage of ADT's lax security and granted themselves unfettered access to other customer accounts—entirely unbeknownst to both the customer and to ADT.

10

33.     Although ADT claims it has implemented procedures to prevent similar incidents in the future, it is already too late for an unknown number of consumers whose accounts and security camera footage have already been accessed and potentially exploited.

### III.     ADT Harmed its Customers by Concealing its Deficient Data Security Practices.

34.     ADT's customers have already suffered significant and lasting harm as a result of its misconduct.

35.     As ADT's own survey revealed, consumers place value in data privacy and security, and they consider issues of privacy and security when making purchasing decisions. In fact, it is widely accepted that consumers are willing to pay higher prices to do business with merchants that better protect their privacy and information—especially security companies. ADT knows this, which is why it went to the trouble of commissioning a survey and issuing a press release claiming that its security related to this very issue was sound.

36.     In addition to ADT's own study, a number of studies have found that U.S. consumers consider security when purchasing goods and services, and that over 50% of consumers would consider paying more to work with a company with better security.[10] Likewise, studies have shown that over 70% of U.S. consumers will provide less personally identifiable information to organizations that suffer a data breach.[11]

37.     Consumer technology markets have likewise demonstrated that consumers value their privacy and security and incorporate data security practices into their purchases. For example, companies have begun providing consumers with "cloaking services" that allow them to browse

---

[10]     *Beyond the Bottom Line: The Real Cost of Data Breaches*, FireEye, https://tinyurl.com/ycvtd2fl (last visited July 15, 2020).

[11]     *Id.*

11

the internet anonymously for a fee. Likewise, companies now offer services that, in exchange for a monthly fee, will offer online services designed to protect data privacy.

38.      Because of the value consumers place on data privacy and security, services with better security practices command higher prices than those without. Indeed, if consumers did not value their data security and privacy, profit-seeking corporations (like ADT) would have no reason to tout their privacy and security credentials to current and prospective customers.

39.      These value propositions reflect the fact that consumers view companies that promise to adequately secure customer data as being far more useful—and valuable—than those with substandard protections.

40.      As a result, a security service with substandard data security and privacy protections is less useful and less valuable than a product or service using adequate security protocols, and is, in reality, a different service entirely. Or, in other words, not a security company at all.

41.      Stated simply, had consumers—like Plaintiff Doty—known the truth about ADT's data security practices—*e.g.*, that ADT did not adequately protect her family's security—they would not have purchased ADT's security services.

## FACTS SPECIFIC TO PLAINTIFF DOTY

42.      Ms. Doty has been a long-time ADT security customer. In approximately 2014, Ms. Doty upgraded her account to the ADT Pulse system which included installing security cameras inside her home. ADT represented to Ms. Doty that this upgrade would enhance her personal security.

43.      Indeed, Ms. Doty relied on ADT's representations, including both representations by ADT employees and ADT's representations on its website, about the ADT Pulse system's safety and security.

12

44.     Shortly thereafter, Aviles installed the ADT Pulse system, which included an indoor security camera with a wide-angle view that provided a visual of a bathroom, entryway, family room and dining space, stairs, and into the master bedroom.

45.     On April 23, 2020, a phone call from ADT destroyed whatever security and safety ADT's security system promised. An ADT "Concierge Representative" called Ms. Doty to explain that one of its technicians (who they did not name) had gained access to her account and therefore had access to her camera, potentially viewing her, her husband, and their minor son, for an unknown amount of time. ADT claimed it was unknown how many times he accessed their camera.

46.     In an email later that day, ADT Concierge Representative Wayne Walker described it as "a difficult message to hear." Difficult is, of course, woefully inadequate to truly describe Plaintiff's loss of security, loss of safety, humiliation, and anger.

47.     Based upon the camera's wide-angle lens and placement, an ADT employee had an opportunity to watch at least the following events:

       a.  Ms. Doty, her husband, and her minor son nude;

       b.  Ms. Doty, her husband, and her minor son in various states of undress;

       c.  Ms. Doty, her husband, and her minor son getting ready for bed;

       d.  Moments of physical intimacy; and

       e.  Private and confidential moments and conversations.

48.     Immediately after the call, Ms. Doty disabled the ADT camera in her home. Ms. Doty expended significant time and money addressing the current and future consequences of the exposure enabled by ADT, including, but not limited to, disabling ADT security hardware and researching additional surveillance and security devices and services.

13

49.     Prior to April 23, 2020, Ms. Doty never received any call, text, email, or notification of any kind informing her that another user was added to her ADT Pulse account or that a user (aside from her) accessed her ADT Pulse account.

## CLASS ALLEGATIONS

50.     **Class Definition**: Plaintiff Shana Doty brings this action on behalf of herself and a class of similarly situated individuals, as well as a sub-class of those individuals, defined as follows:

> **Class:** All ADT Pulse customers in the United States whose security systems were remotely accessed by an employee or agent of Defendant ADT without authorization from the customer.

> **Sub-Class:** All ADT Pulse customers in the United States whose security systems were remotely accessed by Telesforo Aviles without authorization from the customer.

The following people are excluded from the Class: (1) any Judge or Magistrate presiding over this action and the members of their family; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and their current or former employees, officers, and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated by a court of law on the merits; (5) Plaintiff's counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

51.     **Numerosity**: The exact number of members of the Class is unknown and is not available to Plaintiff at this time, but individual joinder in this case is impracticable. The Class likely consist of hundreds of individuals. Members of the Class can be easily identified through

14

Defendant ADT's records. The Sub-Class consists of more than two hundred households, and members of the Sub-Class have already been identified by Defendant ADT.

52.     **Commonality**: There are many questions of law and fact common to the claims of Plaintiff and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include but are not limited to the following:

> a.  Whether Defendant ADT's conduct constitutes a breach of contract;
>
> b.  Whether Defendant ADT's conduct constitutes negligence;
>
> c.  Whether Defendant ADT's conduct constitutes gross negligence;
>
> d.  Whether Defendant ADT's conduct constitutes a violation of the Texas Deceptive Trade Practices Act;
>
> e.  Whether Defendant ADT's conduct constitutes an intrusion upon seclusion;
>
> f.  Whether Defendant ADT's conduct constitutes a violation of the Computer Fraud and Abuse Act;
>
> g.  Whether Defendant ADT's conduct constitutes intentional infliction of emotional distress;
>
> h.  Whether Defendant ADT's conduct entitles the Class to privacy monitoring; and
>
> i.  Whether Defendant ADT's conduct constitutes negligent hiring, supervision, and retention.

There are many questions of law and fact common to the claims of Plaintiff and the other members of the Sub-Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include but are not limited to the following:

> a.  Whether Defendant Aviles's conduct constitutes intrusion upon seclusion;
>
> b.  Whether Defendant Aviles's conduct constitutes a violation of the Computer Fraud and Abuse Act; and

15

      c.   Whether Defendant Aviles's conduct constitutes intentional infliction of emotional distress.

53.    **Typicality:** Plaintiff's claims are typical of other members of the Class and Sub-Class, in that Plaintiff and the members of the Class and Sub-Class sustained damages arising out of Defendants' uniform wrongful conduct.

54.    **Adequate Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Class and Sub-Class and has retained counsel competent and experienced in complex class actions. Plaintiff has no interest antagonistic to those of the Class or Sub-Class, and Defendants have no defenses unique to Plaintiff.

55.    **Predominance and Superiority**: This case is also appropriate for class certification because Class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all parties is impracticable. The damages suffered by the individual members of the Class and Sub-Class will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' actions. Thus, it would be virtually impossible for the individual members of the Class and Sub-Class to obtain effective relief from Defendants' misconduct. Even if members of the Class and Sub-Class could sustain such individual litigation, it would still not be preferable to a class action because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered, and uniformity of decisions ensured.

**FIRST CAUSE OF ACTION**
**Breach of Contract**

16

(**On Behalf of Plaintiff and the Class against Defendant ADT**)

56.     Plaintiff incorporates paragraphs 1-55 as if fully set forth herein.

57.     Plaintiff Doty and the Class members entered into a valid and enforceable agreement with Defendant ADT to install a security system and agreed to pay money for such services. Plaintiff Doty's contract is attached as Exhibit 1.

58.     In a section titled "Services to be Provided," the contract listed "Standard Monthly Service, Burglary," "Safewatch Cellguard," "Extended Limited Warranty/Quality Service Plan (QSP)," and, under the "Other" section, "Pulse." In a section titled "Equipment to be Installed," the contract lists security equipment, including a camera. ADT also agreed to provide equipment, including a camera. Ex. 1 at 2.

59.     Beyond this, the contract does not include any terms describing the function or features of the services provided by ADT. The remainder of the form contract is self-serving (and unenforceable) terms limiting ADT's liability or any responsibility to the consumer.

60.     In the absence of an express term describing ADT's provided services, a material and clearly contemplated implied covenant in the agreement existed between Defendant ADT and Plaintiff (and the putative Class) to provide a security system that was suitable for its advertised purpose and to not contain design flaws that render it and/or access to it vulnerable to unauthorized intrusion resulting in the compromise of user safety and security.

61.     Indeed, as ADT's own survey recognized, consumers expect security companies that provide smart home products, like ADT, to take reasonable measures to protect personal data and information, and ADT says it provides those measures. The contract does not discuss these measures because it is so clearly within the contemplation of the Parties that it is deemed

17

unnecessary to express. The core purpose of the contract is to provide security services designed to keep customers safe and their private lives private.

62.     A meeting of the minds occurred, and Plaintiff Doty and the Class fully performed their obligations under the contracts.

63.     Defendant ADT breached the contract with Plaintiff Doty and Class members by failing to acknowledge the inherent vulnerability in the ADT Pulse system and the ability of a third party to access the security system and various connected security devices including door locks and cameras.

64.     Plaintiff Doty and Class members would not have paid for ADT's security system had they known of these vulnerabilities, but rather would have chosen one of the numerous alternatives that were available to them and which did not present a hidden safety risk.

65.     ADT's failure to fulfill its promises resulted in Plaintiff Doty and Class members receiving services that were of less value than they paid for. Stated otherwise, because Plaintiff Doty and Class members paid for privacy protections that they did not receive—even though such protections were a material part of their contracts with the ADT—they did not receive the full benefit of the bargain. As a result of ADT's breach, Plaintiff Doty and the Class suffered damages in the amount of the difference between the price they paid for ADT's services as promised and the actual, diminished value of its security services.

66.     As a direct and proximate result of ADT's breach of their contracts with Plaintiff Doty and Class members, Plaintiff Doty and Class members have also suffered and will suffer injury, including, but not limited to: the cost of replacement security devices; the cost of additional surveillance and protective devices and services; and time spent monitoring and addressing the current and future consequences of the exposure enabled by ADT.

18

## SECOND CAUSE OF ACTION
### Negligence
### (<u>On Behalf of Plaintiff Doty and the Class against Defendant ADT</u>)

67.     Plaintiff incorporates paragraphs 1-55 as if fully set forth herein.

68.     Defendant ADT had full knowledge of the purpose for which its security cameras were being used and the sensitivity of the people and things the cameras were designed to secure and protect—that which "matters most" to their clients. ADT also knew the types of harm that Plaintiff and the members of the Class could and would suffer if the integrity of the security system was compromised.

69.     ADT had a duty to exercise reasonable care in ensuring that all ADT security systems were secure, safe to use, and inviolable by unauthorized parties. This duty includes, among other things, ensuring that reasonable and proper protocols and safeguards are in place so that consumers' security cameras are not easily compromised by unauthorized users.

70.     Defendant ADT, by and through its agents, employees, and independent contractors, was negligent in its acts and/or omissions by, amongst other things, allowing technicians to create authorized user accounts, and by failing to discover that its employees could make and did make themselves authorized users gaining unauthorized access to Plaintiff's ADT Pulse account, thereby allowing surreptitious videos and images to be viewed and taken of Plaintiff in her home.

71.     Plaintiff and the members of the Class were the foreseeable and probable victims of any inadequate security practices and procedures. ADT knew of or should have known of the

19

inherent risks of allowing ADT cameras to be set up and used without adequate security protocols and safeguards.

72.    Defendant ADT further knew or should have known that: (1) the surreptitious recordings of Plaintiff contained private and confidential information about Plaintiff; (2) Plaintiff had a reasonable expectation of privacy in being partially and fully naked, engaging in consensual intimate activity, and having private conversations in a private home; (3) the recordings were taken without Plaintiff's knowledge or consent; (4) the surreptitious recordings would reveal private and personal things about Plaintiff which ADT and Aviles had no right or authorization to view, use, disseminate, or disclose; and (5) the viewing of these private acts and occasions constitutes a substantial violation of Plaintiff's right of privacy.

73.    Beyond ordinary negligence, Defendant ADT was grossly negligent because the acts and omissions of Defendant ADT and its employee and agents were more than momentary thoughtlessness or inadvertence. Rather the conduct, when viewed objectively from the standpoint of Defendant ADT at the time of these events, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to Plaintiff. Moreover, Defendant ADT had subjective knowledge of the risk of employees gaining unauthorized access to clients' cameras, but failed to disclose to Plaintiff the vulnerability of their monitoring systems and the ability of ADT employees to monitor and observe their home without their consent, and acted with conscious indifference to the rights, safety, and welfare of their clients.

74.    ADT's own actions and inactions created a foreseeable risk of harm to Plaintiff and the members of the Class. ADT's misconduct included, but was not limited to, its failure to sell security systems with sufficiently robust security protocols to prevent unauthorized users from

20

gaining access to the cameras, and failing to inform Plaintiff and the members of the Class when unknown individuals added their email addresses to customer accounts.

75.    ADT was in a position to protect against the harm suffered by Plaintiff and the members of the Class and had a duty to do so.

76.    ADT, through its actions, unlawfully breached its duty to Plaintiff and the members of the Class by failing to ensure their cameras and set up procedures were sufficiently robust to protect against unauthorized use.

77.    But for ADT's wrongful and negligent breach of duties owed to Plaintiff and the members of the Class, Plaintiff and the members of the Class would not have used or purchased a product that is so readily compromised.

78.    As a result of ADT's negligence, Plaintiff and the members of the Class have suffered and will continue to suffer damages and injury including, but not limited to: the cost of replacement cameras; the cost of additional surveillance and protective devices and services; the time spent monitoring and addressing the current and future consequences of the exposure enabled by ADT; and the necessity to engage legal counsel and incur attorneys' fees, costs, and expenses.

79.    Further, because ADT's acts and omissions resulted from gross negligence, exemplary damages should be awarded against ADT in an amount to be determined by the jury in this case. Moreover, exemplary damages should be awarded without limitation, as set forth in Tex. Civ. Prac. & Rem. Code § 41.008(c).

### THIRD CAUSE OF ACTION
### Violation of the Texas Deceptive Trade Practices Act
### <u>(On Behalf of Plaintiff Doty and the Sub-Class against Defendant ADT)</u>

80.    Plaintiff incorporates the foregoing paragraphs 1-55 as if fully set forth herein.

81.     Plaintiff and the Sub-Class are "[c]onsumer[s]" as defined in Tex. Bus. & Com. Code Ann. § 17.45(4) because they are individuals.

82.     Plaintiff and the Sub-Class engaged with Defendant in "[t]rade" or "commerce" as those terms are defined in Tex. Bus. & Com. Code Ann. § 17.45(6) because ADT offers for sale, sells, and/or leases goods and services (or otherwise articles, commodities, or other things of value) to consumers, including selling or leasing security products to Plaintiff and the Sub-Class, and providing related security services, including the Pulse application, to Plaintiff and the Sub-Class, in exchange for monetary payments.

83.     ADT engaged in false, misleading, and deceptive acts and practices in trade or commerce in violation of Tex. Bus. & Com. Code Ann. § 17.46.

84.     ADT failed to disclose the fact that the smart home security services that it provided had material vulnerabilities, and that ADT had not taken reasonable measures to secure those services, in violation of Tex. Bus. & Com. Code Ann. § 17.46(b)(24). ADT knew that consumers valued and expected that their smart home security devices would be secure and free from intrusion. At the same time, ADT knew that was not taking reasonable measures, if any, to ensure that its smart home security devices, including the Pulse application, were actually secure. ADT failed to disclose these facts in order to induce consumers, including Plaintiff Doty and the Sub-Class, to continue purchasing its services, which they would not have done had this information been disclosed—as ADT knew from its survey of consumers in January 2020.

85.     Plaintiff Doty would not have continued to purchase ADT services had she known of the vulnerabilities in the Pulse application. Nor would she have continued to purchase ADT services had she known that ADT was not taking reasonable measures to secure its smart home devices.

22

86.     ADT's course of conduct was unconscionable in violation of Tex. Bus. & Com. Code Ann. § 17.50. ADT's core business is the widespread distribution of products and services to be used within consumers' homes to provide safety, security, and peace of mind. But while doing so, ADT acted with flagrant disregard for prudent and fair business practices—as ADT itself declared them in its January 2020 press release—that permitted ADT's technician, and potentially countless other technicians or employees, to grant themselves unfettered access to its customers' homes.

87.     Plaintiff Doty and the Sub-Class have also suffered and will continue to suffer economic damages, including, but not limited to: the cost of replacement security devices; the cost of additional surveillance and protective devices and services; and time spent monitoring and addressing the current and future consequences of the exposure enabled by ADT. Plaintiff Doty and the Sub-Class have also experienced mental anguish and suffering in the form of anxiety, loss of security, loss of safety, humiliation, and anger.

## FOURTH CAUSE OF ACTION
### Intrusion Upon Seclusion
### (On Behalf of Plaintiff Doty and the Class against Defendant ADT)

88.     Plaintiff incorporates the foregoing paragraphs 1-55 as if fully set forth herein.

89.     ADT intentionally intruded upon Plaintiff's and each of the Class members' seclusion by creating the means and opportunity for its employees to spy on Plaintiff and the Class in one of their most private spaces—their homes—and providing Aviles and potentially others with round-the-clock access to their most intimate moments. Indeed, ADT had an affirmative duty not to let unauthorized third parties gain access to these spaces.

23

90.     ADT's facilitation and failure to stop such access is highly offensive to a reasonable person as it reveals intimate private details about Plaintiff and each of the Class members and the activities they participate in inside the privacy of their own homes.

91.     ADT is also liable for the actions of its agents who accessed Plaintiff's and the Class's security systems, which was done in the normal and routine course and scope of their employment.

92.     ADT's intrusion upon the Plaintiff's and the Class members' seclusion caused Plaintiff and the Class members mental anguish and suffering in the form of anxiety, loss of security, loss of safety, humiliation, and anger.

## FIFTH CAUSE OF ACTION
### Computer Fraud and Abuse Act, 18 U.S.C. § 1030
### (On Behalf of Plaintiff Doty and the Class against Defendant ADT)

93.     Plaintiff incorporates the foregoing paragraphs 1-55 as if fully set forth herein.

94.     The Computer Fraud and Abuse Act ("CFAA") broadly prohibits intentional access to computer systems without authorization or in excess of authorization.

95.     Plaintiff Doty is an individual and therefore a "person" under 18 U.S.C. § 1030(e)(12).

96.     The ADT Pulse system is a "protected computer" under 18 U.S.C. § 1030(e)(2)(B) because it is used in and affects interstate or foreign commerce and communication. Specifically, the ADT Pulse system allows consumers to remotely access and monitor their ADT home security—including viewing security camera footage, opening locks, and arming or disarming the security system—even if the consumer is on the other side of the country or the world. The ADT Pulse system communicates with ADT monitoring centers located at various locations around the country and the consumer either via the internet or via cellular towers.

24

97.     ADT violated the CFAA because one or more of ADT's employees intentionally accessed Plaintiff Doty's and Class members' ADT Pulse security system accounts without obtaining any authorization from the customers. Furthermore, ADT's employees obtained information from Plaintiff Doty's and the Class members' ADT Pulse security systems in the form of video recordings of their homes and any information showing the status of the security system, in general.

98.     As such, Plaintiff Doty and the Class have suffered damages as a result of unauthorized access to their accounts. That is, Plaintiff Doty and the Class now face a significant impairment to the integrity of data, and the ADT Pulse security system in general. Plaintiff Doty and the Class have been subjected to ADT's vulnerability that allowed unauthorized users to control their ADT Pulse systems.

99.     Plaintiff Doty and the Class have also suffered a significant loss as a result of unauthorized access to their accounts. Plaintiff Doty and the Class expended significant time and resources in responding to the ADT's vulnerability and ADT's employees' unauthorized access to their accounts.

100.    Overall, ADT's vulnerability and its employees' unauthorized access to Plaintiff Doty's and the Class members' ADT Pulse systems undoubtedly poses a public safety risk.

**SIXTH CAUSE OF ACTION**
**Negligent Hiring, Supervision and Retention**
**(On Behalf of Plaintiff and the Class against Defendant ADT)**

101.    Plaintiff incorporates the foregoing paragraphs 1-55 as if fully set forth herein.

102.    At all relevant times, Telesforo Aviles was ADT's employee and/or agent.

103.    Whenever in this Complaint it is alleged that ADT did any act or thing, it is meant that each of ADT's officers, agents, servants, employees, or representatives did such act and/or

that at the time such act or thing was done, it was done with the full authorization or ratification of ADT, or was done in the normal and routine course and scope of employment of each of ADT's officers, agents, servants, employees, or representatives.

104.    ADT had the opportunity and duty to screen its employees, including Aviles, to ensure they were fit to perform the duties asked of them.

105.    ADT knew or should have known Aviles was incompetent or unfit. Nonetheless, ADT made the reckless decision to hire and retain Aviles as a technician.

106.    ADT and its agents, servants, and employees, who were at all times acting in the course and scope of their employment, were guilty of negligence toward Plaintiff. Defendant ADT is further liable for the negligent acts of their agents, servants, or employees, including Aviles, under the legal doctrine of respondeat superior. At all relevant times, Aviles was an agent apparent or ostensible agent of Defendant ADT.

107.    ADT's negligence was a proximate cause of Plaintiff's and Class members' injuries and damages, including, but not limited to, ADT's negligence in:

a.  Failing to perform due diligence in contacting Aviles's prior employers;

b.  Failing to adequately evaluate Aviles's mental state prior to hiring;

c.  Any and all actions and omissions as may be proven at trial;

d.  Negligently hiring Aviles in a position allowing him to have access to sensitive client information;

e.  Negligently allowing Aviles to access sensitive client information when Defendant ADT knew, or in the exercise of ordinary care should have known, that Aviles was unfit;

f.  Negligently retaining Aviles in its employ in a position that provided him with

26

access to sensitive client information;

g.  Negligently and inadequately supervising its employees;

h.  Failing to create and/or enforce safety rules, polices, and procedures governing employee conduct regarding access to clients' cameras and other sensitive information;

i.  Failing to warn Plaintiff of the inappropriate and substandard hiring and retention, training, and supervision of their employees; and

j.  Negligently allowing Aviles to accomplish the tort upon Plaintiff by the existence of his agency relationship with Defendant ADT.

108.    These actions and omissions of ADT singularly, or in combination with others, proximately caused damages to Plaintiff and the Class, including mental anguish and suffering in the form of anxiety, stress, loss of security, fear, loss of safety, humiliation, and anger.

**SEVENTH CAUSE OF ACTION**
**Intentional Infliction of Emotional Distress**
**(On Behalf of Plaintiff and the Class against Defendant ADT)**

109.    Plaintiff incorporates the foregoing paragraphs 1-55 as if fully set forth herein.

110.    At all times herein, Aviles acted intentionally, maliciously, and without justification, to gain unauthorized access to Plaintiff's private camera, potentially including video of Plaintiff partially or completely naked and engaging in intimate and other private activities, when Aviles knew or should have known that Plaintiff would suffer severe emotional distress as a result.

111.    The conduct by Aviles was intentional, malicious. and done for the purpose of causing, or was known by Aviles to be likely to cause, Plaintiff to suffer severe emotional distress, and was done with the wanton and reckless disregard of the consequences to Plaintiff.

27

112.     Defendant ADT had a duty to exercise reasonable and ordinary care and caution in and about the management, maintenance, supervision, control, and operation of its systems and each of their employees, agents, and independent contractors, all to the benefit of clients and persons like Plaintiff.

113.     Defendant ADT, by and through its agents, employees, and independent contractors, was reckless in its acts and/or omissions by, amongst other things, allowing technicians to create authorized user accounts, and by failing to discover that Aviles made himself an authorized user and gained unauthorized access to Plaintiff's home camera, thereby allowing surreptitious videos and images to be viewed and taken of Plaintiff in the privacy of her home.

114.     Defendant ADT knew or should have known that: (1) the surreptitious recordings of Plaintiff contained private and confidential information about Plaintiff; (2) Plaintiff had a reasonable expectation of privacy in being partially and fully naked and engaging in consensual intimate activity, and having private conversations, in a private home; (3) the recordings were taken without Plaintiff's knowledge or consent; (4) the surreptitious recordings would reveal private and personal things about Plaintiff which ADT and Aviles had no right or authorization to view, use, disseminate, or disclose; and (5) the viewing of these private acts and occasions constitutes a substantial and outrageous violation of Plaintiff's right to privacy.

115.     These acts were done intentionally or with a conscious and/or reckless disregard of Plaintiff's rights, and with the intent to vex, injure, or annoy, such as to constitute oppression, fraud, or malice. ADT acted outrageously and beyond all reasonable bounds of decency, and intentionally inflicted severe emotional distress upon Plaintiff, to her detriment.

116.     As a direct and proximate result of ADT's aforementioned acts and omissions, Plaintiff suffered emotional injury, mental damage, loss, harm, anxiety, embarrassment,

28

humiliation, shame, and severe emotional distress in an amount subject to proof. These damages are continuing in nature and will be suffered in the future.

**EIGHTH CAUSE OF ACTION**
**Privacy Monitoring**
**(On Behalf of Plaintiff and the Class against Defendant ADT)**

117.    Plaintiff incorporates the foregoing paragraphs 1-55 as if fully set forth herein.

118.    Plaintiff and the Class suffered extreme invasions of their privacy in that ADT's agent or agents have accessed their home security systems, including cameras in their homes. ADT's agents were able to surreptitiously see and record their most intimate moments in a highly protected and personal space.

119.    ADT proximately caused Plaintiff's and the Class's privacy to be violated by designing and maintaining its smart home security products with obvious and significant security vulnerabilities, through which ADT's employees' surreptitious access to Plaintiff's and the Class's cameras was a predictable outcome.

120.    The invasion of privacy that Plaintiff and the Class suffered exposes them to even more alarming, compounding harms: if still or video recordings were made from Plaintiff's and the Class's camera feeds, they can be distributed via the Internet to yet more people. Regrettably, the Internet has long permitted the establishment of well-organized groups for the trading or posting of illicit (or even illegal) material that serves the prurient interest of that group without the knowledge or permission of the subjects.[12] Plaintiff's and the Class's risk of having their private lives exposed on the Internet is significantly increased because of ADT's actions.

---

[12]    Some groups operate more publicly than others, both are of concern here. *E.g.,* FEDERAL TRADE COMMISSION, *FTC, Nevada Obtain Order Permanently Shutting down Revenge Porn Site MyEx* (June 22, 2018), https://www.ftc.gov/news-events/press-releases/2018/06/ftc-nevada-obtain-order-permanently-shutting-down-revenge-porn/.

121.     Swift detection of the content on the Internet is necessary to contain its spread. Each time an image or video is sent to another person, the possibility of removing the image or even mitigating the spread is reduced.

122.     Commercial "takedown services" are available to monitor the spread of images and video, and, for a greater price, will try to get them taken down. In some situations, Plaintiff and the Class may even need to hire counsel. Absent ADT's actions, these services would be unnecessary. These services are broadly accepted as necessary because individuals cannot reasonably monitor the entire Internet or force individuals to take this material down.

123.     Plaintiff and the Class seek injunctive relief, requiring ADT to create a fund sufficient to cover the costs of commercial and/or legal services needed to remedy the invasion of privacy that they have suffered, including (1) monitoring for the distribution of images or video from their homes, (2) taking down any such media that is posted, and (3) providing any such further relief as the Court deems equitable and just.

### NINTH CAUSE OF ACTION
### Intrusion Upon Seclusion
### (On Behalf of Plaintiff Doty and the Sub-Class against Defendant Aviles)

124.     Plaintiff incorporates the foregoing paragraphs 1-55 as if fully set forth herein.

125.     Defendant Aviles intentionally intruded upon Plaintiff's and each of the Sub-Class members' seclusion by spying on Plaintiff and the Sub-Class in one of their most private spaces, their homes, and in their most intimate moments.

126.     Defendant Aviles's spying on Plaintiff and the Sub-Class is highly offensive to a reasonable person as it reveals intimate private details about Plaintiff and each of the Sub-Class members and the activities they participate in inside the privacy of their own homes.

127. Defendant Aviles's intrusion upon the Plaintiff's and the Sub-Class members' seclusion caused Plaintiff and the Sub-Class members mental anguish and suffering in the form of anxiety, loss of security, loss of safety, humiliation, and anger.

**TENTH CAUSE OF ACTION**
**Computer Fraud and Abuse Act, 18 U.S.C. § 1030**
**(On Behalf of Plaintiff Doty and the Sub-Class against Defendant Aviles)**

128. Plaintiff incorporates the foregoing paragraphs 1-55 as if fully set forth herein.

129. The Computer Fraud and Abuse Act broadly prohibits intentional access to computer systems without authorization or in excess of authorization.

130. Plaintiff Doty is an individual and therefore a "person" under 18 U.S.C. § 1030(e)(12).

131. The ADT Pulse system is a "protected computer" under 18 U.S.C. § 1030(e)(2)(B) because it is used in and affects interstate or foreign commerce and communication. Specifically, the ADT Pulse system allows consumers to remotely access and monitor their ADT home security—including viewing security camera footage, opening locks, and arming or disarming the security system—even if the consumer is on the other side of the country or the world. The ADT Pulse system communicates with ADT monitoring centers located at various locations around the country and the consumer either via the internet or via cellular towers.

132. Defendant Aviles intentionally accessed Plaintiff Doty's and Sub-Class members' ADT Pulse security system accounts without obtaining any authorization from the customers. Furthermore, Defendant Aviles obtained information from the Plaintiff Doty's and the Sub-Class members' ADT Pulse security systems in the form of video recordings of their homes and any information showing the status of the security system, in general.

31

133.     As such, Plaintiff Doty and the Sub-Class have suffered damages as a result of unauthorized access to their accounts. That is, Plaintiff Doty and the Sub-Class now face a significant impairment to the integrity of data, and the ADT Pulse security system in general. Plaintiff Doty and the Sub-Class have been subjected to an unauthorized user controlling their ADT Pulse systems.

134.     Plaintiff Doty and the Sub-Class have also suffered a significant loss as a result of unauthorized access to their accounts. Plaintiff Doty and the Sub-Class expended significant time and resources in responding to Aviles's unauthorized access to their accounts.

135.     Overall, Aviles's unauthorized access to Plaintiff Doty's and the Sub-Class members' ADT Pulse systems undoubtedly poses a public safety risk.

**ELEVENTH CAUSE OF ACTION**
**Intentional Infliction of Emotional Distress**
**(<u>On Behalf of Plaintiff and the Sub-Class against Defendant Aviles</u>)**

136.     Plaintiff incorporates the foregoing paragraphs 1-55 as if fully set forth herein.

137.     At all times herein, Aviles acted intentionally, maliciously, and without justification, to gain unauthorized access to Plaintiff's private camera, potentially including video of Plaintiff partially or completely naked and engaging in intimate and other private activities, when Aviles knew or should have known that Plaintiff would suffer severe emotional distress as a result.

138.     The conduct by Aviles was intentional, malicious, and done for the purpose of causing, or was known by Aviles to be likely to cause, Plaintiff to suffer severe emotional distress, and was done with the wanton and reckless disregard of the consequences to Plaintiff.

139.     Defendant Aviles knew or should have known that: (1) the surreptitious recordings of Plaintiff contained private and confidential information about Plaintiff; (2) Plaintiff had a

reasonable expectation of privacy in being partially and fully naked and engaging in consensual intimate activity, and having private conversations, in a private home; (3) the recordings were taken without Plaintiff's knowledge or consent; (4) the surreptitious recordings would reveal private and personal things about Plaintiff which Aviles had no right or authorization to view, use, disseminate, or disclose; and (5) the viewing of these private acts and occasions constitutes a substantial and outrageous violation of Plaintiff's right to privacy.

140.     These acts were done intentionally or with a conscious and/or reckless disregard of Plaintiff's rights, and with the intent to vex, injure, or annoy, such as to constitute oppression, fraud, or malice. Aviles acted outrageously and beyond all reasonable bounds of decency, and intentionally inflicted severe emotional distress upon Plaintiff, to her detriment.

141.     As a direct and proximate result of Aviles's aforementioned acts and omissions, Plaintiff suffered emotional injury, mental damage, loss, harm, anxiety, embarrassment, humiliation, shame, and severe emotional distress in an amount subject to proof. These damages are continuing in nature and will be suffered in the future.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Shana Doty, individually and on behalf of the Class of similarly situated individuals, prays for the following relief against Defendant ADT:

A.     Certifying this case as a class action on behalf of the Class defined above, appointing Plaintiff as the representative of the Class, and appointing her counsel as class counsel;

B.     Declaring that ADT's actions, as set out above constitute a breach of contract, negligence, a violation of the Texas DTPA, intrusion upon seclusion, and a violation of the CFAA;

C.     Awarding damages, including statutory, exemplary, and punitive damages where applicable;

33

D.      Awarding three times Plaintiff's and the Class's economic damages and mental anguish pursuant to Tex. Bus. & Com. Code Ann. § 17.50(b)(1);

E.      Awarding injunctive relief in the form of privacy monitoring;

F.      Awarding Plaintiff and the Class their reasonable litigation expenses and attorneys' fees;

G.      Awarding Plaintiff and the Class pre- and post-judgment interest, to the extent allowable;

H.      Awarding such other injunctive and declaratory relief as is necessary to protect the interests of Plaintiff and the Class; and

I.      Awarding such other and further relief as the Court deems reasonable and just.

**FURTHERMORE,** Plaintiff Shana Doty, individually and on behalf of the Sub-Class of similarly situated individuals, prays for the following relief against Defendant Aviles:

J.      Certifying this case as a class action on behalf of the Sub-Class defined above, appointing Plaintiff as the representative of the Sub-Class, and appointing her counsel as class counsel;

K.      Declaring that Aviles's actions, as set out above constitute intrusion upon seclusion, a violation of the CFAA, and intentional infliction of emotional distress;

L.      Awarding damages, including statutory, exemplary, and punitive damages where applicable;

M.      Awarding Plaintiff and the Sub-Class their reasonable litigation expenses and attorneys' fees;

N.      Awarding Plaintiff and the Sub-Class pre- and post-judgment interest, to the extent allowable;

O.      Awarding such other injunctive and declaratory relief as is necessary to protect the

interests of Plaintiff and the Sub-Class; and

P.      Awarding such other and further relief as the Court deems reasonable and just.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury for all issues so triable.

Respectfully submitted,

**SHANA DOTY**, individually and on behalf of all
others similarly situated,

Dated: July 16, 2020                          By: */s/ Christopher Michael Brown*
                                                        One of Plaintiff's Attorneys

Jay Edelson*
jedelson@edelson.com
Benjamin H. Richman*
brichman@edelson.com
J. Eli Wade-Scott*
ewadescott@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Matthew R. McCarley*
mmccarley@fnlawfirm.com
Christopher Michael Brown
cbrown@fnlawfirm.com
FEARS NACHAWATI, PLLC
5473 Blair Road
Dallas, Texas 75231
Tel: 214.890.0711
Fax: 214.890.0712

Amy M. Carter*
amy@clgtrial.com
Heather V. Davis*
hdavis@clgtrial.com
CARTER LAW GROUP, P.C.
5473 Blair Rd.

35

Dallas, Texas 75231
Telephone: (214) 390-4173

*Admitted via Pro Hac Vice*